08-2437-cv
Connecticut v. Duncan

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2009

(Argued: September 17, 2009                                    Decided:  July 13, 2010)

Docket No. 08-2437-cv

_____

STATE OF CONNECTICUT, GENERAL ASSEMBLY OF THE STATE OF CONNECTICUT,

*Plaintiffs-Appellants,*

— v .—

ARNE DUNCAN, in his official capacity as Secretary of Education,

*Defendant-Appellee,*

CONNECTICUT STATE CONFERENCE OF THE NAACP, INDIVIDUAL MINORITY PARENTS AND

STUDENTS IN CT.,

*Intervenors-Defendants-Appellees*

_____

Before:        B. D. PARKER, STRAUB, AND LIVINGSTON, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the District of
Connecticut (Kravitz, *J.*).  State of Connecticut brought action against the Secretary of
Education, alleging that (1) the Secretary's interpretation of the so-called "Unfunded Mandates
Provision" of the No Child Left Behind Act ("NCLBA") violated the State's statutory and
constitutional rights by requiring the State to expend its own funds to comply with the Act, and

(2) the Secretary violated the Administrative Procedure Act ("APA") by denying the State's request for waivers from the NCLBA's requirements; rejecting the State's proposed amendments to its NCLBA accountability plan; and failing to provide the State a hearing on its proposed plan amendments. The District Court granted the Secretary's motion to dismiss in part, finding, *inter alia*, that it lacked jurisdiction over the State's unfunded mandates claims. In a subsequent opinion, the District Court entered judgment on the record for the Secretary with respect to the remaining APA claims. We AFFIRM, as modified.

—————————————

CLARE E. KINDALL, Assistant Attorney General (Robert J. Deichert, Assistant Attorney General, *on the brief*), Office of the Attorney General, Hartford, CT, *for Appellants*.

ALISA B. KLEIN (Mark B. Stern, *on the brief*), Appellate Staff, Civil Division, Department of Justice, Washington, D.C. (Kent D. Talbert, General Counsel, Department of Education, Gregory G. Katsas, Assistant Attorney General, and Kevin J. O'Connor, United States Attorney, *on the brief*), *for Defendant-Appellee*.

CHRISTOPHER T. SCHULTEN (Andrew J. Rossman and Sunish Gulati, *on the brief*), Akin, Gump, Strauss, Hauer & Feld, LLP, New York, NY (L. Rachel Helyar and Maria Ellinikos, Akin, Gump, Strauss, Hauer & Feld, LLP, Los Angeles, CA; John C. Brittain, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; Angela Ciccolo and Victor Goode, National Association for the Advancement of Colored People, Baltimore, MD; William L. Taylor and Dianne M. Piché, Law Office of William L. Taylor, Washington, D.C.; and James J. Walker, Walker and Associates, Stamford, CT, *on the brief*), for *Intervenors-Defendants-Appellees*.

—————————————

BARRINGTON D. PARKER, Circuit Judge:

The State of Connecticut and the General Assembly of the State of Connecticut (collectively the "State") allege in these proceedings that the Secretary of Education has misinterpreted the meaning of the No Child Left Behind Act ("NCLBA" or "the Act"), 20 U.S.C. §§ 6301-7941, and

has violated the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706. The Connecticut State Conference of the National Association for the Advancement of Colored People (the "NAACP") has intervened on behalf of the Secretary.

The first two claims in the State's Second Amended Complaint (hereinafter the "Complaint") seek a declaratory judgment rejecting the Secretary's interpretation of the NCLBA. Claim I alleges that the Secretary's interpretation is wrong as a matter of statutory interpretation, while Claim II alleges that the Secretary's interpretation violates the Spending Clause and Tenth Amendment of the Constitution. The Complaint's remaining two claims assert that the Secretary violated the APA.

The District Court, in a thorough, thoughtful opinion, granted the Secretary's motion to dismiss in part, finding that it lacked subject-matter jurisdiction to consider the first three claims of the Complaint. *See Connecticut v. Spellings*, 453 F. Supp. 2d 459 (D. Conn. 2006) (hereinafter "*Spellings I*"). That opinion also dismissed as moot Claim IV's allegation that the Secretary failed to provide the State a required hearing, but denied the Secretary's motion to dismiss the balance of Claim IV. *Id.* In a subsequent opinion, the District Court granted the Secretary's motion for judgment on the administrative record with respect to Claim IV's remaining allegations, and also reiterated its dismissal of the State's request for a hearing. *See Connecticut v. Spellings,* 549 F. Supp. 2d 161 (D. Conn. 2008) (hereinafter "*Spellings II*"). Familiarity with *Spellings I* and *Spellings II* is assumed. We affirm, with a small modification: both the District Court's dismissal of the State's claim for a hearing, and its grant of the Secretary's motion for judgment on the record as to Count IV, are *without* prejudice.

3

**I**

The District Court's opinions discuss the relevant provisions of the Act, and we need only briefly review it here. *See Spellings I,* 453 F. Supp. 2d at 468-75. The NCLBA, signed into law by President Bush on January 8, 2002, provides for grants, known as Title I funds, for states to use to fund public education. 20 U.S.C. § 6302. Congress passed the Act pursuant to its power under the Spending Clause of the Constitution, Article I, Section 8. As with all Spending Clause legislation, Congress was permitted to, and did, attach conditions to the receipt of those funds. *New York v. United States,* 505 U.S. 144, 167 (1992). States have the choice whether to fulfill the requirements of the NCLBA, or else forego the grants.

By and large, the Act's provisions require states to administer certain mandatory assessments to students and to demonstrate accountability using the results of those assessments. *See* 20 U.S.C. § 6311(b). Each state that wishes to obtain Title I funds under the NCLBA must submit a plan to the Secretary demonstrating how the state intends to comply with the Act. State plans require the Secretary's approval, and the Secretary is authorized both to reject plans that do not comply with the Act's requirements, *id.* § 6311(e), and to penalize non-compliant states, *id.* § 6311(g). The Secretary may also grant waivers from the Act's requirements. *Id.* § 7861.

At the core of this litigation is the so-called "Unfunded Mandates Provision," which appears in a separate section of the Act entitled "Prohibitions on Federal Government and use of Federal funds," and consists of the following "General Prohibition":

> Nothing in this chapter shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local

4

resources, or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this chapter.

20 U.S.C. § 7907(a).

**II**

Connecticut has accepted substantial Title I educational funds, and has had a plan on file with the Secretary since 2002. In January 2005, the State asked the Department of Education to waive certain of the Act's testing requirements. Specifically, Connecticut sought permission to conduct testing in alternate years rather than annually; to conduct cohort analysis;[1] to assess special education students at their instructional level, rather than at their grade level, if such testing is deemed appropriate by a student's Individualized Education Program ("IEP");[2] and to permit students with limited English proficiency (known as English Language Learners ("ELL" students)) three years in United States schools before assessing their performance.

On February 28, 2005, the Secretary denied the State's waiver requests to conduct alternate-year testing and to phase in ELL students for three years; requested more information about cohort analysis; and indicated that a DOE policy change on special education was forthcoming. The Secretary announced the new special education policy on April 7, 2005. The

---

[1] Cohort analysis examines the academic progress of a single cohort of students as it moves through the educational system, as opposed to comparing the yearly performance of that cohort to other cohorts from previous years. A "cohort" is a single grade level of students (e.g., all of the students currently in the third grade).

[2] Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, every special education student is entitled to an IEP to guide his or her education. *See* 20 U.S.C. § 1414.

5

new policy did not permit testing special education students at their instructional level, even if consistent with a student's IEP.

On May 27, 2005, after extensive correspondence between the parties, Connecticut State Commissioner of Education Betty J. Sternberg reiterated the State's waiver requests regarding alternate grade testing, ELL student phase-in, and testing special education students at their instructional level. In the same letter, Commissioner Sternberg submitted two proposed amendments to Connecticut's NCLBA accountability plan. The proposed amendments essentially embodied the waiver requests for phasing in ELL students and testing special education students at their instructional level, but did *not* discuss the State's waiver request concerning alternate-year assessments.

On June 20, 2005, the Secretary informed Commissioner Sternberg that the proposed plan amendments had been denied. At no point was the State provided the opportunity for a hearing on its proposed plan amendments. In August 2005, the State sued the Secretary. Since then, the State has continued to comply with the Act's requirements, and the Secretary has taken no enforcement action against the State.

**III**

The crux of the State's lawsuit boils down to one core allegation: the Unfunded Mandates Provision of the NCLBA requires the State to be funded the full amount of any costs required to comply with the Act, but the State is nevertheless currently paying more to comply than it is receiving in Title I educational grants. In the State's view, the "Unfunded Mandates Provision" unambiguously prohibits the Secretary from requiring a state to spend its own

6

money to comply with an accountability plan. In the alternative, the State argues, if the meaning of the Unfunded Mandates Provision is ambiguous, then the Act violates the Spending Clause because a state can only agree to be bound by federally imposed conditions on funding when those conditions are set out unambiguously. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Additionally, the State contends, the Secretary's interpretation of the NCLBA violates the Tenth Amendment because its penalties -- namely, the potential loss of all federal education funds -- are "so coercive as to pass the point at which pressure turns into compulsion." *South Dakota v. Dole,* 483 U.S. 203, 211 (1987) (internal quotation marks omitted). The State did not raise these statutory and constitutional arguments to the Secretary when it requested its proposed waivers and plan amendments.

On appeal, the State challenges the District Court's ruling on a number of grounds: (1) its conclusion that it lacked subject-matter jurisdiction over Claims I and II pursuant to *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994), because Congress did not intend for courts to exercise pre-enforcement review of these claims; (2) its determination that Claims I and II are not ripe for review; (3) its finding that the State's request for a hearing on its plan amendments was waived or moot; and (4) its holding that the Secretary's disposition of the State's proposed plan amendments and waiver requests was not arbitrary or capricious. The State also reiterates the merits of its underlying claims about the Unfunded Mandates Provision.

We agree that the State's Unfunded Mandates Provision arguments are not yet ripe for judicial review, and therefore we affirm the District Court's dismissal of Claims I and II on that basis without reaching the issues presented by *Thunder Basin. See Ruhrgas AG v. Marathon*

7

*Oil Co.,* 526 U.S. 574, 585 (1999).  With respect to Claim IV, we cannot conclude -- as the District Court did in *Spellings I* -- that the State's request for a hearing on its proposed plan amendments was waived.  However, because the State now represents on appeal that a hearing would be futile without a resolution of the unfunded mandates issue, and because that issue is not ripe for review, we affirm the District Court's dismissal of Claim IV as well.  Nonetheless, in doing so, we modify the dismissal to clarify that it is without prejudice.  We also affirm the District Court's judgment that the Secretary's ultimate disposition of the State's proposed plan amendments and waivers was neither arbitrary nor capricious, but we clarify that this decision too is without prejudice.

**IV**

With respect to those claims that the District Court found ripe, we have appellate jurisdiction under 28 U.S.C. § 1291.  We review *de novo* a District Court's legal conclusions, including the grant of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Leibovitz v. Cornell Univ.,* 445 F.3d 586, 590 (2d Cir. 2006).  A district court's ripeness determination is also a legal determination subject to *de novo* review, *Murphy  v. New Milford Zoning Comm'n,* 402 F.3d 342, 347 (2d Cir. 2005), as is a grant of judgment on the record, *see Jarvis v. Ford Motor Co.,* 283 F.3d 33, 43 (2d Cir. 2002).

*A.  The Unfunded Mandates Provision*

"Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 807-08 (2003) (internal quotation marks omitted). "At its heart is whether we would benefit from deferring initial review until the claims we are called on to consider have arisen in a more concrete and final form." *Murphy*, 402 F.3d at 347. In the District Court's view, the first two claims of the Complaint will be better decided once there is an administrative record that addresses the State's concerns about the Unfunded Mandates Provision. We agree.

In its leading case on ripeness, the Supreme Court held that determining whether a dispute is ripe for review requires a two-pronged analysis of (1) whether the issues presented to the district court are fit for review, and (2) what hardship the parties will suffer in the absence of review. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). Analyzing the first prong of the ripeness inquiry, the District Court held that Claims I and II were not fit for review until the agency addressed the factual and legal positions at the core of the State's unfunded mandates claims. The District Court noted that an administrative record would help the Court to evaluate the Secretary's claim that "the State can satisfy the testing requirements of the Act in a manner that is fully funded by the federal Government," thus potentially obviating the need for litigation. *Spellings I,* 453 F. Supp. 2d at 490. The District Court observed further that its decisionmaking could only be enhanced by "having some concrete action by the Secretary to review." *Id.* The Court stated that "consideration of the underlying legal issues would necessarily be facilitated if they were raised in the context of a specific attempt to apply and/or enforce the regulation." *Id.*

9

at 491. Next, analyzing the hardship prong, the District Court concluded that the State was not suffering significant hardship because the State remains in compliance with the Act, thus continuing to receive funds while facing "no imminent enforcement action by the Secretary." *Id.* The Court emphasized that it is unclear what steps, if any, the Secretary would take against the State in the event of noncompliance. *Id.* Finally, the District Court observed that the administrative forum remains an alternative venue in which the State can seek relief without risking the consequences of noncompliance. *Id.*[3]

We review the District Court's ripeness determination bearing in mind that "[b]oth aspects of the inquiry involve the exercise of judgment, rather than the application of a black-letter rule." *Nat'l Park Hospitality Assoc.*, 538 U.S. at 814 (Stevens, *J.*, concurring). We have repeatedly observed that "when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later . . . . [not] that the case is not a real or concrete dispute affecting cognizable current concerns of the parties." *New York Civil Liberties Union v.*

---

[3] We also note that although the District Court understandably (and properly) cross-applied its ripeness analysis of Claim I to Claim II, *see Spellings I,* 453 F. Supp. 2d at 494, the doctrine of constitutional avoidance further argues in favor of finding Claim II prudentially unripe. As Judge Leval has written:

> The ripeness principles . . . bear heightened importance when, as in the present case, the potentially unripe question presented for review is a constitutional question. If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 492 F.3d 89, 114 (Leval, *J.,* concurring) (internal quotation marks omitted). *See also Ashwander v. Tennessee Valley Ass'n,* 297 U.S. 288, 347 (1936) (Brandeis, *J.*, concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

*Grandeau,* 528 F.3d 122, 131 (2d Cir. 2008) (quoting *Simmonds v. INS,* 326 F.3d 351, 357 (2d Cir. 2003) (internal citations omitted) (emphasis in original)). "Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Id.*

Although the State is correct that the Secretary's interpretation of the Unfunded Mandates Provision is clear and that the parties have a concrete dispute about its meaning and constitutionality, the District Court did not err in concluding it would benefit from a more developed administrative record and that therefore this case is not yet fit for review. As a result of the State's requested plan amendments and waivers, we know how the State proposes to bridge any gap between its Title I funds and its costs of complying with the NCLBA. But we do not yet have a clear picture of solutions the Secretary might propose, or, for obvious reasons, the State's position on any such solutions. *See Nevada v. Dep't of Energy,* 457 F.3d 78, 84 (D.C. Cir. 2006) (noting that ripeness doctrine is designed in part to protect "the agency's interest in crystalizing its policy before that policy is subjected to judicial review"). The Secretary contends that "the State's cost estimates [for compliance with the NCLBA] reflect a misunderstanding of its statutory obligations," in particular by overestimating the requirements for administering assessments to special education students and ELL students; according to the Secretary, the State can meet its responsibilities under the Act using its current Title I grants. Resp. Br. at 26-28. The State disagrees. While the District Court is capable of resolving this

11

factual and legal dispute, administrative proceedings are a more suitable venue because they will allow for fact-intensive inquiries related to educational finance, the agency's area of expertise. These proceedings will also provide an opportunity for the parties to design an amended plan that satisfies the State's specific fiscal objections. Neither the underlying factual dispute nor the process of designing an amended plan, which might moot the entire lawsuit, are undertakings readily accomplished in the district court in the first instance. *Cf. Sharkey v. Quarantillo,* 541 F.3d 75, 90 (2d Cir. 2008).

The Secretary has taken no final action attributed directly to his interpretation of the Unfunded Mandates Provision, and perhaps further administrative proceedings -- which could include the resolution of pending factual disputes about the Secretary's suggestion of cost-cutting measures different from those already proposed by the State -- would render such final action unnecessary. "[F]aced with a concrete proposal and specific facts . . . the state education department [] and the Secretary would have the opportunity to craft a compromise solution that would avoid the need for a lawsuit." *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 299 (6th Cir. 2009) (en banc) (McKeague, *J.,* concurring).[4] This case therefore differs from *Abbott*, in which the Supreme Court found that a drug manufacturer's challenge of an FDA regulation was fit for review in part because "all parties agree that the issue tendered is a purely legal one" and there was "no claim . . . that further administrative proceedings are contemplated." *Abbott,* 387 U.S. at 149. Judge Kravitz was thus on solid ground in concluding that this case is not yet fit for review.

[4] The Sixth Circuit, considering similar claims, found them justiciable. We disagree, and are more persuaded by Judge McKeague's concurrence.

12

"Even if resolution of a dispute could be facilitated if a court waited for a specific application of the issues in contention, the question may, nonetheless, perhaps be justiciable under the second ripeness factor if the challenged action creates a direct and immediate hardship for the parties." *Nutritional Health Alliance v. Shalala,* 144 F.3d 220, 226 (2d Cir. 1998). Thus, although the issues presented in Claims I and II are not yet fit for review, we still consider the hardship prong with the understanding that it alone can, if sufficiently weighty, render a claim ripe. "In assessing the possible hardship to the parties resulting from withholding judicial resolution, we ask whether the challenged action creates a direct and immediate dilemma for the parties. The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship." *Simmonds,* 326 F.3d at 360 (internal quotation marks and citation omitted).

As the District Court emphasized, the State remains in compliance with the Act and faces no imminent enforcement action by the Secretary. Moreover, the State remains free to propose a new plan amendment based on its unfunded mandates argument. *Spellings I,* 453 F. Supp. 2d at 491. Assuming *arguendo* that the State continues to meet its obligations under the Act while reinitiating the administrative process, the only potential material hardship to Connecticut is any state funds it must continue to expend on compliance. The State cites a study finding that Connecticut's own cost of compliance between 2002 and 2008 totaled $41.6 million. App'x 281. Although we accept all material allegations of the complaint as true for the purposes of a motion to dismiss, *United States v. Vazquez,* 145 F.3d 74, 81 (2d Cir. 1998), and thus assume that the State is in fact accruing these costs, we also note that further

13

administrative proceedings may be the most effective way to save the State this money. The availability of this potentially salutary administrative remedy distinguishes this case from those in which we have found pre-enforcement claims ripe because they forced plaintiffs to "either incur great expense to comply" with a law or else "run the risk of incurring potentially even greater burdens" for noncompliance. *Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir. 1998) (only options livery drivers had to object to a new law requiring payment of bond for their licences was to pay or else to violate the law); *see also Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996) (going through permit process was futile where town dumping statute criminally punished the work for which plaintiff sought a permit).[5]

*B. Plan Amendments*

With respect to its proposed plan amendments, the State claims that it was improperly denied a hearing on those amendments, and that the Secretary's denial of those plan amendments was arbitrary and capricious. In *Spellings I*, the District Court found that the State's request for a hearing was moot because the State had asked the District Court to rule on the merits of those plan amendments and did not ask the District Court to "remand" the case. 453 F. Supp. 2d at 502-03. Although it never moved for reconsideration, the State again raised

---

[5] The State further contends that its rights are undermined by a finding of unripeness because the State is, in the meantime, either being subjected to an erroneous interpretation of the Act, or else an unconstitutionally ambiguous statute. But this argument merely restates the underlying claims; the delay *itself* is not the cause of any constitutional infringement that cannot otherwise be addressed in due course. *Compare Shalala,* 144 F.3d at 227 (finding plaintiffs' underlying First Amendment claim unripe, but noting that a finding of unripeness created a separate prior restraint claim that required immediate disposition).

14

this claim in its motion for a final judgment on the plan amendments. In *Spellings II*, the District Court declined to "revisit its decision to dismiss the State's hearing claim" because it concluded that the State had admitted during oral argument that "the question for the Court is purely one of law for which an administrative hearing is unnecessary." 549 F. Supp. 2d at 171. In *Spellings II*, the District Court also found that the Secretary's decision to deny the State's proposed plan amendments was not arbitrary or capricious. *Id.* at 173-77.

The State contends that the District Court misunderstood the State's position, and that the State has in fact sought a hearing throughout the course of this litigation. On the merits of that claim, the State argues that the District Court should have found that the NCLBA and the Secretary's regulations, taken together, required the Secretary to grant the State's request for a hearing. First, the State relies on the NCLBA provision stating that "the Secretary shall not decline to approve a State's plan before providing a hearing." 20 U.S.C. § 6311(e)(1)(E)(iii). Second, the State points to a regulation providing that "[t]he Secretary uses the same procedures to approve an amendment to a State plan – or any other document a State submits – as the Secretary uses to approve the original document." 34 C.F.R. § 76.142. In the State's view, because the Secretary uses the same procedures to approve amendments to plans as it does to approve the original document, and because the Act specifies that a request for a hearing on the original document must be granted before a plan is rejected, a hearing must be granted before rejecting plan amendments.

As a threshold matter, the District Court may have been mistaken when it concluded in *Spellings I* that the State was not seeking a hearing. In support of that conclusion, the District

15

Court relied on two sources: the Second Amended Complaint, and a brief filed by the State during the course of this litigation. The Second Amended Complaint asked the District Court to "[i]ssue an order to the Secretary requiring her to provide a hearing before she denies a plan amendment." The District Court imprecisely observed that "[i]f the Secretary did in fact violate the Act by not providing the State with a hearing, the proper remedy would be a *remand* for the Secretary to hold a hearing." 453 F. Supp. 2d at 502 (emphasis added). In support of that observation, the District Court cited *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). In *Florida Power*, the Court was considering a petition for review of a decision of the Nuclear Regulatory Commission, which was brought pursuant to a federal statute specifically granting jurisdiction over such petitions to the federal courts of appeal. *Id.* at 746. Here, in contrast, the District Court's jurisdiction was original, pursuant to 28 U.S.C. § 1331, and not appellate. *See* 5 U.S.C. § 703 ("The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments . . . in a court of competent jurisdiction."). Accordingly, it is of no moment that the complaint never used the word "remand," as the District Court's original jurisdiction would have allowed it to order injunctive relief requiring a hearing on the plan amendments. It was enough that the State sought an order requiring that a hearing be held. The brief that the District Court relied on, meanwhile, argued only that further administrative

16

proceedings would be futile with respect to a plan amendment for alternate grade testing, which the State never proposed.[6]

In *Spellings II*, the District Court again found that the State's request for a hearing was moot, this time relying both on its erroneous belief that the request had been waived, and on the separate ground that there is no "need" for such a hearing. 549 F. Supp. 2d at 170-71. The District Court observed, "at argument on the APA appeal, the State once again stated . . . there is no need for a remand or a hearing." *Id.* at 171. The record on appeal, however, suggests that the State's contention below was more nuanced. Though the State was "not adverse to obtaining a remand for a hearing," it felt that a hearing "would be futile" if held *before* "the Court rules on the pending matters of legal interpretation." *See* Pl. Reply Br. in Supp. of Its Mot. for Judg. on the Rec., Doc. No. 148, *Connecticut v. Spellings,* No. 3:05CV13330 (D. Conn. Nov. 5, 2007), at 8-9.

In *Spellings II,* the Court decided some of those legal matters. For the reasons explained by the District Court, we agree that the Secretary's decision to reject the State's proposed plan amendments was neither arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See Spellings II,* 549 F. Supp. 2d at 171-77; 5 U.S.C. § 706(2)(A). The

---

[6] Ironically, the Secretary argued below that the State, had it proposed an amendment about alternate grade testing, "could obtain an administrative hearing and judicial review under the APA" in the event that the Secretary denied the amendment. In response, the State argued that proposing a plan amendment about alternate grade testing would be futile precisely because of the Secretary's track record of failing to provide hearings, as in the case of the State's two already-rejected plan amendments concerning special education testing and ELL phase-in. *See* Pl. Supp. Br. on Matters Raised during the Apr. 28, 2006 Oral Arg., Doc. No. 64, *Connecticut v. Spellings,* No. 3:05CV13330 (D. Conn. May 19, 2006), at 11-12.

17

agency's decision not to grant Connecticut a hearing on its plan amendments, in contrast, may have been "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). But it appears clear from the State's brief on appeal that the pending legal issue that it wants decided is the meaning of the Unfunded Mandates Provision. App. Br. at 57. That issue must remain unresolved, however, because, as the District Court properly held, the State's unfunded mandates argument is not yet ripe for review.

As a result, we are left in a somewhat delicate position. While the State has a strong argument that it was entitled to a hearing on its plan amendments, and while the District Court was not entirely correct in finding that claim moot in *Spellings I,* the State now maintains that "nothing could be gained by remanding the case prior to a ruling on the legal merits" of its unfunded mandates claim. *Id.* Because we find that claim unripe, there is no reason to order a hearing on the plan amendments before the agency addresses the State's amendment and waiver requests in the context of the Unfunded Mandates Provision.

In *Spellings II,* the District Court noted that "immediately after the Court's ruling on the Secretary's Motion to Dismiss, the Court suggested to the State that it consider dismissing Count IV without prejudice in order to allow the State to return to the Secretary to develop a detailed record regarding the State's unfunded mandates argument." 549 F. Supp. 2d at 181. The State did not pursue that suggestion, and now, more than three years later, finds itself in essentially the same position. We believe the Secretary should address the Unfunded Mandates Provision in the first instance at the administrative level. Therefore, should the State wish to propose plan amendments based on its interpretation of the Unfunded Mandates Provision, we

18

agree with the District Court that "the State is free to pursue that issue before the Secretary" because we have not ruled on that claim. *Id.* And, based on our analysis, we think it is important that the State be able to re-raise its claim that it is entitled to a hearing on its plan amendments, should the Secretary fail to provide one. In sum, we decline to reach the issue of whether a hearing is required under the Act because such a hearing is moot unless the State opts to re-raise its unfunded mandates argument by way of a plan amendment, but that issue will no longer be moot if the State does so.

In order to make it clear that the State retains the right to re-propose the same plan amendments, or any other ones, based on its claims about the Unfunded Mandates Provision, and also to continue pursuing its claim that it is entitled to a hearing on its plan amendments, we AFFIRM the District Court's dismissal of the State's hearing claim and its grant of the Secretary's motion for judgment on the record with the MODIFICATION that they are *without prejudice.* We also AFFIRM, but without modification, the balance of the District Court's decision in *Spellings I.*